1  **WO**                                                                    JDN

6                    **IN THE UNITED STATES DISTRICT COURT**

7                         **FOR THE DISTRICT OF ARIZONA**

9   Karl Louis Guillen,                     )   No. CV 08-1279-PHX-MHM (LOA)
                                            )
10            Plaintiff,                     )   **ORDER**
                                            )
11  vs.                                      )
                                            )
12  Gerald Thompson, et al.,                 )
                                            )
13            Defendants.                    )
                                            )
14  _____ )

Plaintiff Karl Louis Guillen brought this civil rights action under 42 U.S.C. § 1983 against Dora Schriro, Arizona Department of Corrections (ADC) Director, and Ronolfo Macabuhay, Lewis Complex physician (Doc. #11).[1] Before the Court are the following motions:

(1) Defendants' Motion for Summary Judgment (Doc. #135);

(2) Plaintiff's Motion to Strike (Doc. #151);

(3) Plaintiff's Cross-Motion for Summary Judgment (Doc. #160);

(4) Plaintiff's Motion for Temporary Restraining Order (TRO) and Preliminary Injunction (PI) (Doc. #178); and

(5) Plaintiff's Motion for Emergency Examination (Doc. #183).

---

[1] Upon screening, the Court dismissed Thompson, Berger, Palosaari, Doe, Breummer, Johnson, Kingsland, Herman, Linderman, Hatfield, Webb, Cooper, Butryn, Smith, Rios, Kocho, Parsons, Mendoza, Sikes, Curran, Zavala, and Coleman as Defendants (Doc. #13).

The Court will grant Defendants' summary judgment motion, deny Plaintiff's motions, and terminate the action.

## I. Background

Plaintiff initiated this action in July 2008 (Doc. #1), and he submitted his First Amended Complaint on September 8, 2008 (Doc. #11). His claims stem from his confinement in the Arizona State Prison Complex (ASPC)-Lewis, Rast Unit in Buckeye, Arizona (id. at 1).[2] Plaintiff alleged that in April 2008, he began to suffer pain, allodynia, and hyperalgesia (id. at 3).[3] He alleged that from May 10 to May 18, he submitted 14 Health Needs Requests (HNRs) for treatment of his extreme pain from postherpetic neuralgia (PHN), which Plaintiff described as "constant and unrelenting pain" and "the worst type of pain known to mankind" (id.).[4] Plaintiff claimed that this pain interfered with his ability to sleep, eat, exercise, and function. Plaintiff averred that when he was finally seen on May 18, Macabuhay informed him that treatment could only be provided for up to 7 days because there was no long-term treatment available (id. at 3-3(A)).

Plaintiff alleged that Defendants were aware that he was experiencing tachycardia, high blood pressure, and severe weight loss due to the pain (id. at 3(A)). Plaintiff further alleged that Defendants were aware that in 2005, Plaintiff was taken to the University of Arizona Pain Clinic for an epidural spinal injection to alleviate pain caused by a prior flare-up. Plaintiff contended that Schriro restricted Macabuhay's ability to effectively treat Plaintiff's condition in part by reducing the medical care contract, which cut medical staff, and by eliminating the majority of pharmacies that provided medication. Plaintiff alleged

---

[2]In July 2009, Plaintiff was transferred to Eyman-Special Management Unit (SMU) I in Florence, Arizona (Doc. #76).

[3]Allodynia is a condition in which ordinarily nonpainful stimuli evoke pain, and hyperalgesia is extreme sensitivity to painful stimuli. Stedman's Medical Dictionary allodynia and hyperalgesia (27th ed. 2000).

[4]Neuralgia is defined as "pain of a severe, throbbing, or stabbing character in the course of distribution of a nerve." Stedman's Medical Dictionary neuralgia (27th ed. 2000).

that both Defendants were deliberately indifferent to his serious medical condition (id.).[5]

On December 22, 2008, the Court screened the amended pleading and ordered service on Defendants (Doc. #13). Service was executed in February 2009 (Doc. ##14-15). The following month, Defendants submitted their Answer (Doc. #22), and the Court issued a Scheduling Order (Doc. #23). Since that time, Plaintiff has filed at least 11 motions for injunctive relief, primarily concerning his ongoing medical care, none of which have been granted (see Doc. ##28-29, 47, 55-56, 58-59, 108, 143, 154, 166).

Defendants have now moved for summary judgment (Doc. #135).

## II.  Parties' Contentions

### A.    Defendants' Motion

#### *1. Facts*

In support of their motion, Defendants submit a separate Statement of Facts (DSOF) (Doc. #136). DSOF are supported by Macabuhay's declaration (id., Ex. B), which in turn is supported by various attachments, including a copy of ADC's Pharmacy Technical Manual; copies of Plaintiff's medical records; and a copy of ADC's Health Services Manual on Outside (Speciality) Care and Clinics (id., Attachs. 3-5). Defendants also submit the declarations of Paulette Boothby, an ADC pharmacist (id., Ex. C) and Schriro (id., Ex. D). The relevant portion of DSOF sets out the following facts:

Macabuhay did not see Plaintiff on May 18, 2008 (DSOF ¶ 50). Rather, he saw Plaintiff on May 29, 2008, in response to Plaintiff's complaint of extreme pain in the right side of his chest from PHN (id.). Macabuhay noted Plaintiff's PHN history and ordered that he receive an injection of 20 mg of Nubain, a potent analgesic equivalent to morphine that helps reduce pain, and an injection of 25 mg of Phenergan, an antihistamine that helps reduce itching (id. ¶ 51). Macabuhay also recommended that the Medical Review Committee refer Plaintiff to an outside consultant for epidural injections (which are provided at a pain management clinic), completed a request for lidocaine patches, and wrote prescriptions for

---

[5]This claim was set forth in Count I of Plaintiff's Complaint (Doc. #11 at 3-3(A)). Plaintiff's nine other counts were dismissed for failure to state a claim (Doc. #13).

an analgesic balm and Tylenol with Codeine (id.).

To fill prescriptions, the ADC maintains pharmacies within each ADC unit that are independent of the ADC physicians (id. ¶ 25). The ADC pharmacies operate on a drug formulary system (id. ¶ 31). When a physician writes a prescription, it is transmitted to the pharmacy, which fills the prescription and contacts the inmate for pick-up or other arrangements based on any existing security concerns (id. ¶ 26). Any prescription for a Brand name is dispensed by the Generic substitution (id. ¶ 29). Physicians do have the ability to request non-formulary drugs; however, they have no authority or control over how or when the ADC pharmacy fills prescriptions (id. ¶¶ 31, 27).

Pursuant to a mandate issued by the state legislature, the ADC began consolidating and automating prison pharmacies in 2005 (id. ¶ 34). This consolidation plan served to reduce costs and increase accuracy through bar-code driven automation of prescription fills, inventory control process, and a reduction in sites required for specialized pharmaceutical support (id.). Various prison pharmacies were closed; however, the pharmacies at Lewis, Eyman, Perryville, Phoenix, and Tucson remained opened and provided services to those prison complexes that lost pharmacies (id. ¶¶ 36-41).

Except for the lidocaine patches, the prescriptions written by Macabuhay following the May 29, 2008 appointment were filled the next day (id. ¶ 51).

As to Macabuhay's request for an outside consultant for epidural injections, the Medical Review Committee does not refer inmates directly to the University of Arizona pain management clinic; rather, the Review Committee refers inmates to an outside neurologist for evaluation and treatment, which may include a referral for injections at a pain management clinic (id. ¶ 52).

Macabuhay saw Plaintiff again on June 12, 2008, in response to complaints of worsening pain and that the analgesics were not working (id. ¶ 53). Macabuhay ordered that Plaintiff receive an injection of 20 mg of Nubain and 25 mg of Phenergan, discontinued the analgesic balm prescription, and requested the status on the drug request for lidocaine patches and the outside consultant request for epidural injections (id.). Nurse Hoffman gave

- 4 -

Plaintiff an injection of 20 mg of Nalbuphine HCL, a generic equivalent for Nubain, and 25 mg of Phenergan (id.).

On June 19, 2008, Macabuhay saw Plaintiff and ordered another 20 mg of Nubain and 25 mg of Phenergan (id. ¶ 54). Hoffman gave Plaintiff 20 mg of Nalbuphine HCL and 25 mg of Phenergan (id.).

On July 10, 2008, Macabuhay saw Plaintiff again and noted acute exacerbation of PHN (id. ¶ 55). Macabuhay ordered that Plaintiff receive medical ice for eight days, lay-in (no work and meals in cell) for eight days, and he requested a check of the status on the lidocaine patches (id.). Macabuhay also ordered that Plaintiff receive 20 mg of Nubain and 25 mg of Phenergan daily for ten days (id.). Hoffman administered the injections (id.).

Macabuhay then saw Plaintiff on July 31, 2008, in response to Plaintiff's increasing pain in the right side of his chest (id. ¶ 56). Macabuhay again ordered follow-up on the request for lidocaine patches, and he ordered another 20 mg of Nubain and 25 mg of Phenergan, which were administered by Hoffman (id. ¶ 56).

Macabuhay saw Plaintiff again on August 14, 2008, at which time Plaintiff complained of right-side pain but said that the Nalbuphine and Phenergan injections helped (id. ¶ 57). Macabuhay submitted a drug request for Methadone and ordered that the Nalbuphine and Phenergan injections continue for 7 more days, and he increased the Phenergan from 25 mg to 50 mg (id.). Macabuhay also re-submitted the outside consultant request for a referral to a pain management clinic (id.).

On August 26, 2008, Central Office approved the request for non-formulary Neurontin (substitute for Methadone) (id. ¶ 58). On September 11, 2008, Macabuhay noted in Plaintiff's medical record that the request for a referral to a pain management clinic was denied by Central Office, which instead recommended up to 900 mg of Neurontin a day; up to 100 mg of Elavil every night; lidocaine ointment; and capsaicin, a nonsteroidal anti-flammatory drug, or Tylenol (id. ¶ 59). Meanwhile, Plaintiff continued to take 300 mg of Gabapentin (a generic equivalent for Neurontin), three times a day, with a seven-day supply provided every Wednesday (id. ¶¶ 59-60).

On September 25, 2008, Macabuhay saw Plaintiff, who reported that the Neurontin/Gabapentin appeared to decrease his pain slightly (id. ¶60). Macabuhay noted that Plaintiff was ambulatory and did not appear to be in much distress; however, he did appear more depressed, and he was not responding to the current PHN treatment (id.). Macabuhay increased the Neurontin/Gabapentin from 300 to 600 mg 3 times a day for 30 days and from 600 to 900 mg 3 times a day for 6 months thereafter (id.). Macabuhay also submitted another drug request for lidocaine patches and ordered a Nubain injection. Hoffman administered the injection, and the pharmacy filled Plaintiff's prescription for 90 60-mg tablets of Gabapentin with a seven-day supply provided each Wednesday (id.). Macabuhay renewed the Gabapentin prescription on November 5, 2008 (id.).

On November 12, 2008, Macabuhay noted in Plaintiff's medical record that the May 29 and September 25, 2008 requests for lidocaine patches were disapproved, as was the request to increase Plaintiff's dosage of Neurontin/Gabapentin and the request for an outside consultant/referral to a pain management clinic (id. ¶ 61). Macabuhay documented his recommendation to treat Plaintiff with lidocaine patches, nonsteroidal anti-inflammatory drugs, and to increase Neurontin/Gabapentin, which Plaintiff was currently taking at a dosage of 900 mg three times a day (id.). Macabuhay also ordered a check to see if Plaintiff had ever taken Elavil (id.).

On November 13, 2008, Macabuhay saw Plaintiff and determined that there were no side effects from the Neurontin/Gabapentin, noted that Plaintiff could not take Elavil, and found that his PHN was under control (id. ¶ 62).

Macabuhay did not see Plaintiff again until June 23, 2009, at which time Plaintiff appeared in acute distress when his right side was touched (id. ¶ 63). Macabuhay ordered that Plaintiff receive 20 mg of Nubain and 25 mg of Phenergan; Hoffman administered the injections. And Macabuhay submitted a request to the Medical Review Committee for an outside consultation with a pain management clinic for epidural injections (id.)

On July 21, 2009, Plaintiff was transferred from the Lewis complex to ASPC-Eyman SMU I, where he was moved to the care of another physician at that facility (id.).

Since his transfer, Plaintiff has been seen by a neurologist, who referred Plaintiff to a pain management clinic (id. ¶ 76). The record reflects that Plaintiff received epidural injections at a pain management clinic in January and February 2010 (Doc. #176 at 1).

### 2. *Legal Arguments*

Defendants move for summary judgment on the grounds that they were not deliberately indifferent to Plaintiff's medical needs and they are entitled to qualified immunity (Doc. #135). Defendants argue that the facts show that ADC has expended considerable time and resources providing medical care to Plaintiff for his PHN (id. at 12). They maintain that although there was a reduction in the number of prison pharmacies, that reduction did not affect Plaintiff's care or prescriptions because the pharmacies at the Lewis Complex—where he was housed when his claim arose—and at the Eyman Complex—where he was subsequently housed, were not closed or changed (id. at 13). Defendants assert that the restrictions on Plaintiff's prescriptions were due to his failure to follow prescribed time and dosage requirements, which left him unable to possess a large quantity of his medication (id.). Defendants acknowledge that there were isolated instances of delay in filling Plaintiff's prescriptions, but they note that ADC pharmacies filled 670,193 inmate prescriptions in 2008 and even more in 2009 (id.).

Defendants contend that Macabuhay timely responded to Plaintiff's medical needs and, in fact, provided care beyond constitutional standards (id.). They further contend that there is no evidence that Schriro violated Plaintiff's right to treatment or sanctioned a constitutionally deficient health care program for inmates (id.).

Defendants next argue that even if there were sufficient facts to establish a constitutional violation, they are entitled to qualified immunity (id. at 14). They assert that Schriro has no medical training and no involvement in establishing medical protocols or prescribing treatment; thus, it would not be clear that her actions violated Plaintiff's Eighth Amendment rights (id.). As to Macabuhay, Defendants contend that Macabuhay had no authority to send Plaintiff to outside providers absent further authorization, so it would not be clear to him that his actions in treating Plaintiff were unlawful (id. at 14-15).

### B. Plaintiff's Response[6]

Plaintiff's initial response to Defendants' motion was his own Motion to Strike specific portions of DSOF (Doc. #151). Plaintiff contends that various paragraphs within DSOF are misrepresentations, based upon fraud, and constitute hearsay (id. at 1).

Plaintiff then filed a combined Motion for Summary Judgment and Response to Defendants' motion and his own separate Statement of Facts (PSOF) (Doc. ##160, 162).

#### 1. Facts

Plaintiff's response memorandum and PSOF are supported by approximately 370 pages of exhibits that include his own affidavit with attached medical records (Doc. #160, Ex. A, Attach. 7); copies of grievance appeals to Schriro related to his medical care (id., (second) Attach. 1); Macabuhay's responses to interrogatories (id., Ex. D); Schriro's responses to requests for admissions (id., Ex. O); and a copy of ADC's Manual on Non-Formulary Drug Requests (id., Ex. R).[7] The relevant portion of PSOF presents the following facts:

On May 12, 2008, Plaintiff filed an emergency HNR for PHN pain; however, he was not seen by Macabuhay until May 29, 2008 (Doc. #162, PSOF ¶ 23). Macabuhay was aware of Plaintiff's chronic condition, which required specific treatment (id. ¶ 24). Plaintiff suffered in pain from approximately June 8 until September 25, 2008, and from June 20 to

---

[6]The Court issued a Notice pursuant to Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) (en banc), informing Plaintiff of his obligation to respond (Doc. #137).

[7]The remaining attachments and exhibits, which are not directly related to the issues in this suit, include the following: copies of reviews of Plaintiff's book, copies of certificates of completion or achievement he has earned in prison, ADC policies governing placement in maximum security and Plaintiff's grievances and appeals related to his placement (Doc. #160, Attach. 1-6); excerpts from various publications on high blood pressure, Gabapentin, chronic pain, and space research (Attachs. 9-11); a copy of ADC's policy on protective segregation (id., Ex. 1, Attach. 13; Ex. T); copies of some of Plaintiff's previously filed motions for injunctive relief (id., (second) Attach. 3); copies of ADC's Fiscal Year Appropriations Reports from 2005-2009 (id., Ex. F); the declarations and copies of Health Needs Requests from inmates Edward Valenzuela, Abel Trujillo, Robert Martinez, and Aaron Kraft (id., Exs. K, M-N, Q); excerpt from "Rights of Prisoners," third edition (id., Ex. L); and the copy of a stipulation for injunctive relief in a 2001 case in the United States District Court for the Northern District of Ohio (id., Ex. U).

July 9, he had no medication (id. ¶¶ 25-29, 31). Although Macabuhay wrote prescriptions in August 2008 for Lidocaine, Methadone, and Gabapentin, "[o]nly a low dose of Gabapentin arrived" (id. ¶ 30).

From late September to mid-November, 2008, Plaintiff's pain level was reduced slightly; however, Macabuhay noted that Plaintiff was not responding to treatment, and Macabuhay was informed by Central Office that multiple medications would be necessary to treat Plaintiff's PHN (id. ¶ 32). Plaintiff suffered in extreme pain from mid-November, 2008 to May 12, 2009 (id. ¶ 33).

On May 8, 2009, Macabuhay and Director Ryan permitted Plaintiff to be placed into a "hot cell" in the Rast detention unit without medications, bedding, or toiletries; these conditions increased Plaintiff's pain and led to his transport to the Complex emergency room on May 12, 2009 (id. ¶ 34).[8] On June 23, 2009, Macabuhay noted that Plaintiff was in acute distress and gave Plaintiff a pain shot but sent him back to the detention unit cell (id. ¶ 36).

In July 2009, Plaintiff was transferred to SMU I. Upon his arrival to SMU I, Plaintiff was taken via ambulance to St. Mary's hospital for treatment (id. ¶ 37).

On each of the nine occasions that Macabuhay examined Plaintiff from May 2008 through July 2009, Plaintiff's blood pressure was extremely high (id. ¶ 40).

### 2. Legal Arguments

Plaintiff argues that he has suffered from an ongoing denial of adequate medical treatment and that Defendants have been deliberately indifferent to his serious medical condition (Doc. #160 at 4).

Plaintiff asserts that beginning in May 2008, Macabuhay issued temporary relief in the form of pain shots; however, prescriptions for other medications were never filled or

---

[8]Plaintiff was placed into detention for disciplinary reasons in response to a charge of gambling (Doc. #45 at 3). Plaintiff filed motions for a TRO and an injunction related to his detention placement (Doc. ##28-29). The Court ordered briefing and subsequently denied Plaintiff's motions on the ground that the evidence showed that Plaintiff went without medications for just four days, that he received treatment—including a pain shot and medications—on May 12, 2008, and that thereafter he maintained possession of allergy medications and medicine for his PHN (Doc. #91 at 11-12).

issued (id. at 6).  Plaintiff claims that as a result, he suffered extreme pain regularly between pain shots (id.).  Plaintiff also asserts that Macabuhay merely issued a pain shot in response to Plaintiff's suffering after he was placed in a "hot cell" in May 2009, and Macabuhay even returned him to the "hot cell" despite the exacerbating effect of the heat and stress from the housing conditions (id. at 7).  And Plaintiff claims that Macabuhay failed to address Plaintiff's high blood pressure, which has resulted in extreme pain, the inability to function, stage 3 high blood pressure, and cardiovascular pain (id. at 8).  Plaintiff concludes that Macabuhay's actions constitute deliberate indifference (id.).

As to Schriro, Plaintiff asserts that her budget reductions for outside services and pharmacy "reduction" since 2006 have effectively denied Plaintiff adequate medical treatment and that ADC policies restricted Macabuhay from providing adequate medical treatment (id. at 4-5).  Plaintiff states that the outside services budget was consistently around $70-85 million per year from 2003 to 2006, but in 2006, Schriro cut that budget by $52 million (id. at 9).  Plaintiff maintains that he was unable to see a physician every month, even for emergency chronic care and extreme pain, because there was insufficient staffing at the Lewis Complex (id. at 9).  He states that he was on a 6 1/2 month waiting list at SMU I to see a doctor for an emergency HNR (id.).

Plaintiff argues that the ADC pharmacy formulary does not contain appropriate analgesic agents to manage his PHN, and, consequently, ADC has over-dosed Plaintiff on Gabapentin despite Plaintiff's medical history showing that he would suffer side-effects from Gabapentin (id. at 5).  He also states that there is no ADC protocol for treating PHN (id. at 10).  Plaintiff asserts that under ADC policy, the treating physician has no final determination in Plaintiff's treatment because there are administrative restrictions—Technical Manuals governing non-formulary drugs, algorithms, and the Medical Review Committee—that restrict treatment (id.).  Plaintiff contends that these restrictions were not present prior to Schriro's budget cuts (id.).

Plaintiff alleges that Ryan, as the current ADC Director, is also liable individually

because he was put on notice of the emergency nature of Plaintiff's condition but disregarded the risk to Plaintiff (id. at 11).

With respect to Defendants' claim of qualified immunity, Plaintiff notes that Defendants do not contest that his medical condition was sufficiently serious to constitute a serious medical need, and he asserts that the facts clearly demonstrate that Defendants were well aware of the risk to Plaintiff (id. at 11-12).

Plaintiff concludes by requesting summary judgment against both Macabuhay and Schriro, and he requests that the Court convene a 3-Judge Panel for Release Order and place ADC's health care services under Federal Receivership (id. at 15).

## C.    Defendants' Reply

In response to Plaintiff's Motion to Strike, Defendants note that most of Plaintiff's objections to certain paragraphs within DSOF are not supported by a reference to the record or any other evidence (Doc. #173). Defendants argue that to the extent that Plaintiff cites to evidence to support his motion, those citations fail to support his objections (id. at 4). They submit that Plaintiff's motion is based on his own conclusory statements or inappropriate references to the record (id. at 4-5).

As to Plaintiff's evidence submitted with his motion/response, Defendants contend that much of the affidavit testimony fails to meet the prerequisites of admissibility—based upon personal knowledge, admissible at trial, and offered by a competent affiant (id. at 5-7). They further contend that PSOF are compound, conclusory, and argumentative (id. at 7). Defendants note that PSOF protests his current custody assignment and alleges deprivation of due process; issues unrelated to this action (id.). Defendants argue that references Plaintiff cites in support of his PSOF are themselves conclusory statements from Plaintiff's affidavit (id.). And Defendants assert that Plaintiff is not competent to make the numerous medical observations and conclusions that he makes throughout his affidavit and response (id.). They also assert that Plaintiff likewise does not have the competence to testify to matters regarding state-agency funding, pharmacy funding, staffing and protocols, or the ADC heath care

delivery system (id. at 7-8).  Defendants submit that PSOF should be disregarded in its entirety (id. at 8).

In reply in support of their summary judgment motion, Defendants argue that Plaintiff does not dispute that Macabuhay examined him numerous times and provided treatment, nor does Plaintiff proffer evidence to support that Macabuhay was deliberately indifferent (id. at 9).  Defendants contend that Plaintiff's claim against Schriro is supported only by isolated incidents where he did not receive timely prescriptions, which they claim is insufficient to defeat summary judgment (id. at 10).  And they maintain that there are no grounds for granting Plaintiff's request for mandatory injunctive relief.  Defendants note that the Court—in addressing a prior preliminary injunctive motion—has already found that Plaintiff is receiving "treatments considered to have the best efficacy in treating post-herpetic neuralgia" (id. at 11, citing Doc. #127 at 7).

## III.    Legal Standards

### A.    Summary Judgment

A court must grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Under summary judgment practice, the movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Devereaux v. Abbey, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

If the movant meets its burden with a properly supported motion, the burden then shifts to the nonmovant to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Auvil v. CBS "60 Minutes", 67 F.3d 816, 819 (9th Cir. 1995); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The nonmovant need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed

- 12 -

factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). By affidavit or as otherwise provided by Rule 56, the nonmovant must designate specific facts that show there is a genuine issue for trial. Anderson, 477 U.S. at 249; Devereaux, 263 F.3d at 1076. The nonmovant may not rest upon the pleadings' mere allegations and denials, but must present evidence of specific disputed facts. See Anderson, 477 U.S. at 248.

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Id. at 249. In its analysis, the court must believe the nonmovant's evidence, and draw all inferences in the nonmovant's favor. Id. at 255.

### B. Eighth Amendment

To prevail on an Eighth Amendment medical-care claim, a prisoner must demonstrate "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" and (2) that the defendant's response was deliberately indifferent. Jett, 439 F.3d at 1096 (citations omitted).

A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). In the medical context, deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's

pain or possible medical need and harm caused by the indifference. Jett, 439 F.3d at 1096. Prison officials are deliberately indifferent to a prisoner's serious medical needs if they deny, delay, or intentionally interfere with medical treatment. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). But a delay in providing medical treatment does not constitute an Eighth Amendment violation unless the delay was harmful. Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989) (citing Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam)).

"[A] mere 'difference of medical opinion . . . [is] insufficient, as a matter of law, to establish deliberate indifference.'" Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004) (citation omitted). Therefore, to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the course of treatment the doctors chose was medically unacceptable in light of the circumstances and that it was chosen in conscious disregard of an excessive risk to plaintiff's health. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

## IV. Analysis

### A. Plaintiff's Motion to Strike

The Court finds that many of Plaintiff's objections to DSOF concern facts that are not relevant. Further, as argued by Defendants, some of Plaintiff's objections are completely unsupported or not adequately supported by the referenced citations (see Doc. #173 at 4). As to any pertinent remaining objections, the Court confirms that it may not consider inadmissible or unsupported facts in its summary judgment analysis and therefore has not relied on any evidence that would not be admissible at trial. See Fed. R. Civ. P. 56(e); Orr v. Bank of Am., 285 F.3d 764, 773 (9th Cir. 2002). Plaintiff's Motion to Strike will therefore be denied, as will Defendants' request that PSOF be disregarded in its entirety.

### B. Macabuhay

Defendants do not dispute that Plaintiff's PHN condition constituted a serious medical need, thereby satisfying the first prong of the deliberate indifference test. Estelle, 429 U.S.

at 104.  Thus, the summary judgment analysis on Macabuhay's liability turns on whether his response to Plaintiff's serious medical need was deliberately indifferent.  <u>See</u> <u>Jett</u>, 439 F.3d at 1096.

Macabuhay maintains that he was not deliberately indifferent to Plaintiff's serious medical need.  In his declaration, Macabuhay describes his examinations of Plaintiff from June 2007 through June 2009, during which time he saw Plaintiff approximately 14 times and conducted at least two reviews of Plaintiff's medical records independent of those office visits (Doc. #136, Ex. B, Macabuhay Decl. ¶¶ 27-29, 32-36, 38-42).  Macabuhay's averments and the attached medical records reflect that Macabuhay responded to Plaintiff's complaints, prescribed various medications and changed the dosages according to Plaintiff's responses, and submitted requests for additional treatment to the Medical Review Committee (<u>see</u> <u>id.</u>).

Macabuhay explains that he has no control over the pharmacy's handling of prescriptions and that the process is similar to the civilian sector's physician/pharmacy relationship; he writes the prescription and the pharmacy fills it and provides it to the inmate (<u>id.</u> ¶¶ 18-20).  Defendants' evidence includes the copies of the policies governing non-formulary drug requests, which Plaintiff claims most of his required medication constituted (<u>id.</u>, Attach. 6).  According to the Technical Manual on non-formulary drug requests, the request is submitted to the Key Contact Pharmacist, who either approves the request or suggests alternative therapies and then forwards the request to the Central Office and the ADC Clinical Pharmacist (<u>id.</u> at 2, §§ 3.0, 3.2).  According to the Manual, the request is then sent to the Medical Program Manager or Health Services Bureau Administrator for approval (<u>id.</u> § 3.2).  This evidence demonstrates that once Macabuhay wrote prescriptions for various medications, the ultimate provision of those medications—whether they were on the ADC formulary or were non-formulary drugs—was through the ADC pharmacy, which was out of Macabuhay's authority and control.

Plaintiff does not dispute that he saw Macabuhay regularly from 2007-2009, or that Macabuhay provided the treatment described in his declaration (<u>see</u> Doc. #160, Ex. 1, Pl.

Aff. ¶¶ 9, 11). Also, Plaintiff acknowledges that Macabuhay's prescriptions are subject to approval by the pharmacist and that some treatment protocols are subject to approval by the Medical Review Committee (id. ¶¶ 11-12). Much of Plaintiff's affidavit concerns his complaint over the inability to see Macabuhay or another ADC physician immediately in response to his HNRs seeking treatment (see ¶¶ 9-10). But as Macabuhay explains, the HNRs are reviewed by a nurse who determines whether a physician's involvement is required and if so, schedules an appointment (Doc. #136, Ex. B, Macabuhay Decl. ¶ 15). Thus, like the provision of prescription medication, this is an aspect of the health care system beyond Macabuhay's control.

Plaintiff asserts that Macabuhay was deliberately indifferent because he failed to address Plaintiff's high blood pressure. The evidence Plaintiff relies on in support of this claim is his affidavit, and in the respective paragraphs in his affidavit, Plaintiff's only citation is to an article from the Mayo Clinic Family Health Book on high blood pressure (Doc. #160, Ex. A, Pl. Aff. ¶ 10, citing Attach. 9). This is not competent evidence to show deliberate indifference by Macabuhay. Standing alone, Plaintiff's conclusory allegations that Macabuhay failed to adequately treat his high blood pressure are insufficient to prevent summary judgment. See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir. 1988); see also Hutchinson v. United States, 838 F.2d 390, 393 (9th Cir. 1988) (granting summary judgment against a plaintiff who relied only on her own allegations and conclusory statements that defendants had been negligent and who failed to provide affidavits or depositions of experts).

When a prisoner attempts to hold a prison employee responsible for deliberate indifference, the prisoner must establish individual fault. Leer, 844 F.2d at 634. Plaintiff has failed to do so here. Indeed, Plaintiff's own evidence and admissions support the conclusion that in his capacity as an ADC physician, Macabuhay provided adequate treatment for Plaintiff's PHN. At the most, Plaintiff establishes a disagreement with some of the decisions regarding his health care and prescribed medications. But in the absence of any competent evidence to show that Macabuhay's decisions or course of treatment were medically

unacceptable under the circumstances, Plaintiff cannot demonstrate a material factual dispute that Macabuhay disregarded an excessive risk to Plaintiff's health and was deliberately indifferent. See Toguchi, 391 F. 3d at 1058; Jackson, 90 F.3d at 332. The Court will therefore grant summary judgment to Macabuhay, and deny Plaintiff's request for summary judgment on this claim.

## C. Schriro

Next, the Court addresses Plaintiff's claim that Schriro is liable for deliberate indifference based on budget cuts made during her tenure as ADC Director; Plaintiff alleges that those cuts affected staffing and access to prescription medication to such a degree that his care fell below Eighth Amendment standards (Doc. #160 at 9-10). Plaintiff also claims that in a July 2008 grievance appeal, Schriro was put on notice that he was denied medical treatment (Doc. #162, PSOF ¶ 47).

Plaintiff's claim against Schriro alleges both individual and official-capacity liability. To establish individual-capacity liability, Plaintiff must show that Schriro personally participated in the violation of Plaintiff's constitutional rights, acted with deliberate indifference to Plaintiff's constitutional rights, or failed to take action to prevent further misconduct. King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987). To show official-capacity liability, Plaintiff must demonstrate that action taken pursuant to an official government policy or custom caused a constitutional violation. Berry v. Baca, 379 F.3d 764, 767 (9th Cir. 2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978) (if the defendant is sued in her official capacity, the plaintiff must set fourth facts to support that the defendant either created the harm or acted pursuant to an official policy of custom that caused the constitutional injury).

Schriro avers that she does not have a medical degree, did not create medical treatment protocols, and was not involved in providing or denying treatment to inmates (Doc. #136, Ex. D, Schriro Decl. ¶¶ 4-5). She further avers that she delegated the management of inmate health services to the Health Services Bureau Administrator, who in turn assigned the

Medical Programs Manager to develop healthcare policies and procedure (id. ¶ 3). Plaintiff submits that his only contact with Schriro was through a grievance appeal, which he notes was signed by another officer on her behalf (Doc. #162, PSOF ¶ 47). Thus, there is no evidence that Schriro was aware of Plaintiff's treatment or any delays and failed to act in disregard to the risk to Plaintiff's health. See May v. Enomoto, 633 F.2d 164, 167 (9th Cir. 1980) (the prison director "could not be charged with responsibility for the neglect or delay, if any, of his subordinates in the absence of his direction or participation therein").

To support his official-capacity claim against Schriro, Plaintiff asserts that cuts to staffing left him and other inmates unable to see physicians weekly or monthly, even for emergency care (Doc. #160 at 9). He further asserts that Schriro's changes to health care policies meant that physicians could no longer provide direct treatment to inmates (Doc. #162, PSOF ¶ 12). But, as discussed above, there is no evidence to support a finding that Plaintiff's medical care fell below Eighth Amendment standards or otherwise violated federal law. The record shows that from June 2007-June 2009, Plaintiff saw Macabuhay approximately 14 times (Doc. #136, Ex. B, Macabuhay Decl. ¶¶ 27-29, 32-36, 39, 41-42). The record further shows that since July 2009, Plaintiff has been seen by either ADC physicians or outside consultant physicians on at least 7 occasions (id., DSOF ¶¶ 65-66 (July 21, 2009), ¶ 70 (July 31, 2009), ¶ 76 (Oct. 27, 2009); Doc. #180, Ex. A (Jan. 12, 29, Feb. 5, 12)).

Plaintiff's declarations from other inmates also fail to support his claim that inmates are forced to wait months for medical care because there is insufficient documentary evidence to support the declarations, and the evidence that is attached does not support that there were delays in medical care. For example, the HNRs accompanying Valenzuela's affidavit show that when he sought mental health care for hearing voices, he saw a psychiatrist within two weeks (Doc. #160, Ex. K, Attach. at 1 (Sept. 7, 2009 HNR) and 4 (Sept. 19, 2009 HNR—complaining about the psychiatrist he saw)). And Martinez avers that he submitted several HNRs in June/July 2009, but was not seen until an emergency medical

service was activated; however, he does not indicate when that emergency medical service was activated, and there are no medical records attached to the declaration (id., Ex. N).

To the extent that Plaintiff or another inmate may have experienced an isolated delay in medical care, Plaintiff submits no evidence to demonstrate that any such delays were attributable to policy changes caused by budget cuts made by Schriro's administration. "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) (citation omitted); see Monell, 436 U.S. at 692 (the practice or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled policy").

Plaintiff next alleges that the consolidation of ADC pharmacies resulted in restrictions to non-formulary drugs, which he needed to control his PHN (Doc. #160 at 10; see Doc. #151 at 2 par 5 (Pl. identifying Gabapentin and Lidocaine as non-formulary drugs)). But Plaintiff's allegations regarding receipt of his non-formulary medications are contradictory. He asserts that his prescriptions were often never filled (see Doc. #151 at 2 ¶¶ 9, 11); yet, he also states that his Gabapentin prescription dosage has not been increased, that he now suffers side-effects from taking Gabapentin, and that the lidocaine patches do not provide sufficient relief (Doc. #162, PSOF ¶¶ 42-43, 45). These claims demonstrate that Plaintiff has, in fact, received his medications.

As to the efficiency of the ADC pharmacies following consolidation, Macabuhay avers that he observed minimal to no disruption on inmates' ability to timely receive prescriptions and there have been no notable changes in the pharmaceuticals available for prescriptions (Doc. #136, Ex. B, Macabuhay Decl. ¶¶ 24-25). According to the ADC Pharmacy Program Manager, the consolidated prison pharmacy system filled 670,000 prescriptions in 2008 and 688,000 prescriptions in 2009 (id., Ex. C, Boothby Decl. ¶¶ 2, 17). This evidence reflects that the consolidated pharmacy system has maintained the ability to

meet the high prescription demands of the prison population. Regardless, Plaintiff does not dispute that the consolidation of pharmacies was pursuant to a mandate from the state legislature, not the result of any policy or order from Schriro or ADC officials (Doc. #136, DSOF ¶ 34).

In sum, absent evidence of a constitutional deprivation, Plaintiff cannot demonstrate a material fact that Schriro is liable in either her individual or official capacity. See Jackson v. City of Bremerton, 268 F.3d 646, 653-654 (9th Cir. 2001) (a supervisor cannot be held liable under § 1983 where no constitutional violation has occurred). The Court will grant summary judgment to Schriro and deny Plaintiff's request for summary judgment.

Defendants' qualified immunity arguments need not be addressed.

**V.    Plaintiff's Motions for Injunctive Relief**

In his Emergency Motion for TRO and PI, Plaintiff alleges that since February 2010, he has lost feeling in his left foot and is unable to walk normally (Doc. #178). Plaintiff states that there is a 6-month waiting list to see a physician and therefore seeks injunctive relief in the form of an immediate examination by ADC physicians and an outside specialist and a show cause hearing why Plaintiff should not be released on a medical furlough (id. at 7). The motion is supported by Plaintiff's attached declaration; there are no medical records attached (id., Attach.).

Plaintiff's Motion for an Emergency Examination repeats the allegations concerning the loss of feeling in his foot and inability to see a physician (Doc. #183). Plaintiff cites to various passages from an attached excerpt of an article on strokes (id. at 2-3, Attach.).

Defendants oppose the motions and submit copies of medical records documenting Dr. Brian Page's examinations of Plaintiff on January 12 and 29 and February 5 and 12, 2010; these records reflect that Plaintiff's vital signs were consistently stable (Doc. #180, Ex. A; Doc. #184).

To obtain a preliminary injunction, the movant must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008). The Court finds that Plaintiff falls short of establishing eligibility for injunctive relief. More importantly, because the Court is granting Defendants' summary judgment motion, Plaintiff's motions for injunctive relief are moot. Accordingly, both motions will be denied.

**IT IS ORDERED:**

(1) The reference to the Magistrate is withdrawn as to Defendants' Motion for Summary Judgment (Doc. #135), Plaintiff's Motion to Strike (Doc. #151), Plaintiff's Cross-Motion for Summary Judgment (Doc. #160), Plaintiff's Motion for TRO and PI (Doc. #178), and Plaintiff's Motion for Emergency Examination (Doc. #183).

(2) Plaintiff's Motion to Strike (Doc. #151) is **denied**.

(3) Defendants' Motion for Summary Judgment (Doc. #135) is **granted**.

(4) Plaintiff's Cross-Motion for Summary Judgment (Doc. #160) is **denied**.

(5) Plaintiff's Motion for TRO and PI (Doc. #178) and Motion for Emergency Examination (Doc. #183) are **denied**.

(6) The Clerk of Court must dismiss this action and enter judgment accordingly.

DATED this 23rd day of June, 2010.

_____
Mary H. Murgula
United States District Judge